**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

**UNITED STATES OF AMERICA**

**-vs-**                                              **Case No.  5:04-cr-37-Oc-22GRJ**

**WESTLY BRIAN CANI**

_____

**MEMORANDUM SENTENCING OPINION**

**I.  FACTUAL BACKGROUND**[1]

On October 8, 1998, the Defendant, Westly Brian Cani ("Cani"), was sentenced
to a term of ninety-six months imprisonment for the assault of a United States Postal
Service employee with intent to steal property of the United States, namely stamps.[2]
After previously being confined at the United States Penitentiary ("USP") in Atlanta,
GA, Cani was transferred to USP Coleman in Coleman, Florida on August 21, 2001.
Cani's scheduled release date was October 8, 2005.

While serving his ninety-six month sentence at USP Coleman and within two
years of his scheduled release date, Mr. Cani, a jailhouse lawyer and a self-professed
drug addict, managed to get caught in the crosshairs of a government-led investigation of
drug activity at the prison.  The investigation, which began in approximately January of
2003, was headed by Federal Bureau of Investigation ("FBI") Special Agent James

---

[1]      The factual background in this case is taken from the Presentence Report and from various
testimony given at Cani's trial.

[2]      Cani's criminal history began with at age seventeen with a juvenile adjudication for shoplifting
in 1972. Prior to his 1998 conviction for assaulting a postal worker, Cani had also been adjudicated guilty of grand
theft, retail theft, perjury, loitering and prowling, failing to appear, possession of cocaine, attempted purchase of
crack cocaine, carrying a concealed weapon, battery, resisting arrest without violence, possession of a firearm by
a convicted felon, attempted purchase of heroin, and possession of heroin.

Martin Raby, Jr. ("Raby"). USP Coleman inmate Eric Jones ("Jones"),hoping to reduce his life sentence, orchestrated a controlled drug transaction that involved Cani, Cani's cell mate, Harry Kevin Becker ("Becker"), and Jones.

Intelligence officers for the Bureau of Prisons brought Jones to Special Agent Raby's attention as someone who might be able to assist with the investigation.  Jones operated a highly profitable illegal gambling pool known as a "ticket" at USP Coleman. Jones' ticket, which was against prison rules, allowed inmates to place bets on various sporting events.  United States postal stamps are the inmates' currency of choice at USP Coleman, and Jones' activities allowed him to accumulate numerous books of stamps.

One day, an intelligence officer entered Jones' cell and found a large amount of stamps.  The stamps were confiscated and Jones' attempts to recover his stamps from the officer were unsuccessful.  Jones says that sometime thereafter, the intelligence officer asked Jones if he wanted his stamps back "in helping him assist cleaning up the compound full of drug activity."  When Jones passed up the offer, the intelligence officer asked Jones what Jones would be interested in.  It is not surprising that Jones, an inmate serving a life sentence for a drug-related offense, responded that he would be interested in "going home."

Jones stated during trial that he was told that he was at his own risk if he continued his gambling activities within the prison before Washington, D.C. gave "approval."  The approval Jones' was referring to was the authorization that Special Agent Raby needed from the Department of Justice to utilize Jones in the investigation and to allow Jones to continue operating his gambling ring.  It is unclear how long it took

-2-

for Special Agent Raby to receive authorization.  Nevertheless, there is no evidence in the record to suggest that Jones' activities were terminated or otherwise interrupted by law enforcement between the time that Jones was solicited to be an informant and the time that he was authorized as one.

Jones testified at trial that he knew Cani prior to becoming a Government informant.  Jones and Cani both worked on the same "detail," collecting trash around the prison compound.  Jones also testified that after he and Cani "got to know each other," Cani assisted Jones with filing motions for relief from his prior convictions in state court.

On November 19, 2003, Jones informed the FBI that Becker and Cani were selling heroin inside USP Coleman.  Jones stated that on November 17, 2003, he observed a Bureau of Prisons Correctional Officer place a cigarette pack on a bench outside the H-unit at USP Coleman.  Jones then observed Becker retrieve the pack. Within a few hours, Becker was selling heroin within the USP Coleman compound.

Jones was given a body recorder on November 19, 2003.  The contents of the recorder contained eight different recording sessions.  Three of those recordings are summarized as follows:

> Recording Number 4: On November 20, 2003, at approximately 12:43 p.m., Jones and Ray Gonzalez discuss a previous heroin deal.  Jones also has a conversation with Cani.  Cani advised Jones that Becker no longer had grams of heroin to sell, but will sell Jones 11 papers of heroin for 40 books of stamps, whereas the stamps are valued at $5.00 per book.

> Recording Number 5: On November 20, 2003, at approximately 1:31 p.m., Jones meets with Becker and pays him 40 books of stamps for 11 papers of heroin.

> Recording Number 8: On November 20, 2003, at approximately
> 7:28 p.m., Jones meets with Cani and accepts 11 papers of heroin.

On November 21, 2003, Special Agent Raby recovered the body recorder that had previously been given to Jones and ten packets [3] of powdered heroin.

On May 24, 2004, Becker was interviewed about his involvement with heroin distribution by an FBI special agent at USP Coleman.  Becker was advised of his *Miranda* rights and waived them.  Becker stated that he has been a long time heroin user and that he regularly used heroin with his friend, Cani.  Becker further stated that he and Cani usually purchased heroin for personal use, but on one occasion did sell heroin to another inmate at USP Coleman.  The sale occurred in November 2003 and was initiated when Jones approached Cani about the purchase of one gram of heroin.  Becker stated that on the same day that Jones approached Cani about the sale, Becker and Cani met with Jones in the recreation yard to discuss the details of the heroin purchase.  Becker advised Jones that he did not have gram quantities of heroin to sell, but could provide him with papers.  Becker agreed to sell Jones approximately ten papers of heroin in exchange for forty books of stamps.  The next day, Becker met with Jones and received forty books of stamps for the negotiated heroin purchase.  Becker then took the stamps and provided them to another inmate who he and Cani regularly purchased from.  Becker stated that the inmate then provided Jones with the ten papers of heroin purchased and also provided Cani and Becker with four hits of heroin as payment for their finders' fee.

---

[3]     The use of the word "packets" instead of "papers" may be the result of a typographical error in the Presentence Report.

Becker stated that he and Cani used the four hits of heroin later that day and joked about

how Jones was probably setting them up.

On May 24, 2004, Cani was interviewed about his involvement with the

distribution of heroin by Special Agent Raby at USP Coleman.  Cani was advised of his

*Miranda* rights, waived them, and submitted the following written statement:

> I have been at Coleman USP since August of 2001.  I started using
> heroin in May of 2002 until February 2004. During this time
> period I possessed heroin and did what I had to do to obtain it.  I
> gambled to get money and did legal work to buy it.  I would
> occasionally give some to friends.  Inmate Jones had given me
> heroin on a couple of occasions.  My cellie Becker and I would get
> high together and we would purchase heroin occasionally.  I knew
> the possession of heroin in a fed prison was wrong and I regret my
> actions.  I have cooperated with the FBI to the best of my ability
> and recollection and want to get this matter resolved.  I have a
> disease of drug addiction and need help.  I just want to stop using
> drugs and get home to my children.

Cani denies that he ever negotiated the sale, collected payment for the sale, or provided

heroin to Jones.  The amount of heroin that Cani was responsible for is at least 0.10

grams.

On July 28, 2004, a Grand Jury for the Middle District of Florida, Ocala Division,

returned a four-count Indictment (Doc. No. 1) against Cani.  Count One charged that

Cani knowingly and intentionally conspired to distribute and to possess with intent to

distribute heroin in violation of 21 U.S.C. § 846.  Count Two charged that Cani

knowingly, willfully, and intentionally distributed and caused the distribution of heroin in

violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2.  Count Three charged

that Cani, as an inmate of federal prison, knowingly, willfully, and intentionally obtained

and attempted to obtain, and caused the obtaining of a prohibited object, heroin, in violation of 18 U.S.C. § 1791(a)(2), (b)(1), and (d)(1)(C) and 18 U.S.C. § 2.  Count Four charged that Cani knowingly, willfully, and intentionally provided and caused to be provided a prohibited object, heroin, to an inmate of a federal prison in violation of 18 U.S.C. § 1791(a)(1), (b)(1), and (d)(1)(C) and 18 U.S.C. § 2.  On June 17, 2005, the Government filed an Information and Notice of Prior Convictions (Doc. No. 101) pursuant to 21 U.S.C. § 851 providing notice for the enhancement of penalties.  On June 22, 2005, Cani was found guilty by jury verdict on all four counts.

The sentencing hearing for Cani began on September 13, 2005.  Because Cani's counsel did not discuss the presentence report with him, the sentencing was continued until October 27, 2005.  The sentencing hearing was again continued because Cani's counsel still had not fully discussed the presentence report and possible objections with him.  Ultimately, Cani was appointed new counsel who represented him at the sentencing hearing which finally took place on August 18, 2006.

## II.  GUIDELINE RECOMMENDATIONS

Counts involving the substantially the same harm are grouped together into a single group.  *See* USSG § 3D1.2.  In Cani's case, all four Counts are grouped together.[4] When such grouping occurs, the Guidelines direct that the offense level applicable to a group is the offense level applicable to the most serious count in the group.  *See* USSG §

---

[4]       Cani's Counts are grouped together because Count One charges a conspiracy and Count Two charges the object of that conspiracy, *see* USSG § 3D1.2(b), and because Counts Three and Four embody conduct that is treated as a specific offense characteristic to the guideline applicable to Counts One and Two.  *See* USSG § 3D1.2(c).

3D1.3(a).  In Cani's case, Count Four, which charged violations of 18 U.S.C. § 1791, has the highest offense level.

The guidelines for sentencing violators of 18 U.S.C. § 1791 are found in USSG § 2P1.2.   Section 2P1.2(a)(2) assigns a base level 13 for the mere possession of a narcotic drug in prison.[5]  That base level doubles, however, when the element of distribution is factored into the offense.  Section 2P1.2(c)(1) states that "[i]f the object of the offense was the distribution of a controlled substance, apply the offense level from § 2D1.1."  Because 0.10 grams of heroin is at issue, Cani would have a base level of 12 under § 2D1.1(c).  Cani's base level would increase by an additional two levels under § 2D1.1(b)(3) because "the object of the offense was the distribution of a controlled substance *in a prison*."  Therefore, Cani's base level under § 2D1.1 would be 14.  However, § 2P1.2(c)(1) goes on to state that "if the defendant is convicted under 18 U.S.C. § 1791(a)(1) and is punishable under 18 U.S.C. § 1791(b)(1), and the resulting offense level is less than level 26, increase to level 26."  Therefore, because Cani was convicted of providing or attempting to provide a prohibited object to an inmate under 18 U.S.C. § 1791(a), his base level automatically increases from a level 14 to a level 26.  By contrast, if Cani had only merely possessed the heroin instead of passing it along to an inmate, his base level would only be 13.  In effect, Cani's base offense level is 13 levels higher than if he had merely possessed the heroin in prison instead of passing it along to an inmate.  Also, had Cani merely possessed the

---

[5]       Heroin is a narcotic drug.  *See United States v. Mariazal*, 421 F.2d 835 (5th Cir. 1970) (holding that a district court correctly took judicial notice of the fact that heroin is a narcotic drug).

heroin on the street instead of in a prison, his base level would only be 12 instead of 26.
*See*  USSG § 2D1.1(c).

Additionally, Cani is a career offender as defined in USSG § 4B1.1.  As such,
Cani's sentence under the Guidelines would be subject to enhancement.  Cani's two prior
felony convictions for crimes of violence enhanced his statutory maximum penalty to
thirty years.  As such, Cani's total offense level increases from a 26 to 34.  Additionally,
Cani's criminal history is a category VI.  According to the sentencing table, Cani's
recommended sentence under the Guidelines would be between 262 to 327 months, or
twenty-one years and ten months to twenty-seven years and three months.  Also, any
sentence Cani received would run consecutive to the sentence that he was serving at the
time of the violation.  *See* 18 U.S.C. § 1791(c). Cani was released from USP Coleman in
October 2005 and has been held in county jail since then.

## III.  LEGAL ANALYSIS

The Supreme Court in *United States v. Booker*, 125 S. Ct. 738, 764-65 (2005), excised
the portions of the Federal Sentencing Act, 18 U.S.C. §§ 3553(b)(1) and 3742(e), that made
the application of the Guidelines mandatory.  The *Booker* Court wrote:

> The district courts, while not bound to apply the Guidelines, must
> consult those Guidelines and take them into account when sentencing.
> The courts of appeals review sentencing decisions for
> unreasonableness.  These features of the remaining system, while not
> the system Congress enacted, nonetheless continue to move sentencing
> in Congress' preferred direction, helping to avoid excessive
> sentencing disparities while maintaining flexibility sufficient to
> individualize sentences where necessary.

*Id.* at 767 (citation omitted).  Therefore, while courts have flexibility in determining an

appropriate sentence, it is still necessary for this Court to take the Guidelines into account.

Cani raised two objections to the Guideline calculation.  The first objection related

to his denial of a two level reduction for acceptance of responsibility.  Cani takes the

position that he had no choice but to go to trial because he was never offered a plea

agreement by the Government.  Cani's trial counsel testified at the sentencing hearing.  It

was her understanding that Cani wanted to go to trial.  She admitted that she did not speak

to the prosecutor about offering a plea to Cani.  At that time, Cani's sole concern was

getting out of prison to be with his children.  Cani stated at one of the sentencing

proceedings that he didn't understand that he had the choice of pleading guilty without a

plea agreement.  While counsel's failure to properly advise Cani about his ability to plea

without a plea agreement may be something that could be addressed by way of a 2255

petition, it is not grounds for him to receive a reduction under the Guidelines.

His second objection was to the career offender status.  Cani asserts that the career

offender status should not be applied to him because carrying a concealed weapon is not a

"crime of violence" under Florida law.  The Eleventh Circuit has held to the contrary in

*United States v. Gilbert*, 138 F.3d 1371, 1372 (11th Cir. 1998).  Next, he argues that the

career offender status should not be applied because, despite numerous orders from the

state court judge, the Bureau of Prisons refused to deliver him to the hearing which was

scheduled on his collateral attack of the state court qualifying offense.  Additionally, he

argues that his criminal history in general is overstated.

The arguments presented by Cani are factors that can be taken into consideration by the Court in fashioning a reasonable sentence but are not properly grounds for departure from the Career Offender Guidelines.

In addition to the Objections to the Guideline calculation, Cani asserted several grounds for departure from the Guidelines.  They include the following:

4A1.3 Criminal History

5H 1.3 Mental and Emotional condition

5H 1.4 Physical Condition

5H 1.6 Family ties and Responsibilities

5K 2.0 Aggravating/ Mitigating Circumstances

5K 2.10 Victim's Conduct.

Cani presented testimony from the court appointed Psychiatrist, Dr. Danziger, who examined Cani. Dr. Danziger testified concerning Cani's mental and emotional condition. He also touched on physical condition, family ties and responsibilities, and other mitigating circumstances.  Testimony was also presented by the attorney representing Cani in the state case seeking to terminate his parental rights.

Cani is a heroin addict; moreover, the Bureau of Prisons knew of his addiction. However, there is nothing in the record that indicates that Cani has a history of drug distribution.  By contrast, there is a great deal of evidence about Cani's history of substance abuse.

Cani advised that he initially smoked marijuana when he was fourteen years old and that he began drinking alcoholic beverages when he was seventeen years old,

activities that he continued on a sporadic social basis until his arrest on February 5, 1998. Cani also advised that he has experimented with amphetamines, barbiturates, and hallucinogens.  Cani stated that he first used powder cocaine in 1980 on a social basis. Cani's use increased to free basing and "shooting" the substance or using "crack cocaine" when nothing else was available.  Cani claims that he used cocaine daily from 1980 until his arrest on February 5, 1998.  In order to support his cocaine habit, Cani sold his residence and other assets before eventually turning to crime.  Cani stated that he attended drug treatment in the Martin County Correctional Facility in 1993 and as a result, his cocaine use slowed.  However, at that point Cani started using heroin.  Cani explained that he "shot" heroin everyday from 1993 to the time of his arrest in February of 1998, a habit that cost Cani between $200 and $300 a day.

Cani stated that he began to use heroin again between May 2002 and February 2004 while incarcerated at USP Coleman.  While at USP Coleman, Cani tested positive for heroin on January 30, 2003, May 3, 2003, and January 7, 2004.  Additionally, on August 27, 2002, Cani admitted to drug use though no urinalysis was taken.  Cani says that from 1983 to 1998, he has been imprisoned and "cleaned up" approximately four times and each time he experienced withdrawals, but when released and placed in a stressful situation, he resorted back to drug use.  Also, since being incarcerated at USP Coleman, Cani has completed a forty hour drug education class.  However, Cani has advised that he has a drug problem and wants treatment.

By inviting Cani to participate in a transaction in close proximity to heroin, the drug to which he is addicted, the Government exerted a sort of pressure on Cani.

-11-

Although in Cani's situation the Government's actions did not rise to the level of entrapment, Cani's addiction to heroin likely made him more susceptible to being involved in a transaction involving heroin.  Additionally, the Government's use of Eric Jones as an informant is troubling. There was evidence proffered, which Jones denied, that Jones had previously given heroin to Cani for his personal use.  Jones, a convicted felon serving a life sentence, was able to engage Cani in the controlled transaction as easily as he did because of his prior relationship with Cani.  The Government was able to use that prior relationship to entice Cani, who was nearly finished serving his prison term, to participate in the transaction.  Jones himself had nothing to lose by participating–he was already serving  life in prison and cooperating with the Government provided him a possible opportunity to gain a reduction in his sentence.

Furthermore, the Government's construction of the transaction to include a distribution offense augmented the harshness of the penalty that Cani would face.  Had the transaction ended with Jones' payment to Becker, or with Cani's mere possession of the ten papers, the sentence recommended by the Guidelines would be drastically lower.

This is an unusual case.  The overriding factor in Cani's case is his drug addiction.  This addiction to heroin got him into the federal prison system to begin with and is what put him in a criminal history category VI.  The sentencing judge, in the one federal case he had, requested the Bureau of Prisons to provide him with drug treatment while in Bureau of Prisons' custody.  He was given a forty hour drug course which was not repeated despite his continued use of heroin during his incarceration.  There was no evidence presented to suggest that Cani was bringing drugs into the prison or that he was a

-12-

big time dealer.  None of his prior convictions were for drug distribution.  Moreover, there was evidence indicating that a prison guard (or guards) was responsible for the introduction of drugs into USP Coleman.

The sentencing range of 262 to 327 months recommended by the Guidelines does not comport with the purposes set forth in 18 U.S.C. § 3553(a)(2).  The Guidelines would impose a sentence far greater than necessary.  After considering the grounds for departure, the testimony received at trial and the sentencing hearings, and in light of the Government's role in the drug transaction, Cani's heroin addiction, and the small amount of the drug involved, the Court finds that a low end Guidelines sentence is more appropriate.

The decision on where in the Guidelines to place Cani after considering his raised grounds for departure results in a significant departure from the sentencing range of 34 VI. Had Cani been arrested for distribution of heroin on the street he would have been scored at level 14 VI or thirty-seven-forty-six months.  This Court's departure to level 6 VI is extraordinary.  However, absent such an extraordinary departure Cani would be placed in the very situation that caused the problem in the first place.  Therefore, another approach was necessary.

Whereas the Court cannot order the Bureau of Prisons to give Cani drug treatment, the Court can order the United States Probation Office to provide drug treatment to the Defendant.  This sentence was decided upon careful consideration of all the options available to the Court.  No reasonable sentence of Cani in this case can be fashioned without a guaranty of drug treatment.

-13-

For the reasons stated herein, the Court imposed on Cani sentence of twelve months with 180 days of community confinement.[6]  A sentence of twelve months is sufficient "to afford adequate deterrence to" the criminal conduct of engaging in drug sale transactions in federal prisons while balancing the need to impose a sentence no greater than necessary.  18 U.S.C. §§ 3553(a) and (a)(2)(B).[7]  Given Cani's previous unsuccessful attempts to terminate his drug use, this sentence will provide Cani with the ability to participate in a drug rehabilitation program.  *See* 18 U.S.C. § 3553(a)(2)(D).  This sentence gives Cani a chance to fully rehabilitate, thus "protect[ing] the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(C).  Furthermore, given the small amount of the drug involved–less than 0.10 of a gram–and given the circumstances of the offense–a transaction arranged by the Government–a sentence of twelve months

---

[6]    Because Cani's prior prison term has expired, the consecutiveness provision of 18 U.S.C. § 1791(c) does not apply.

[7]    Section 3553(a) of the Federal Sentencing Act lists several "[f]actors to be considered in imposing a sentence." 18 U.S.C. § 3553(a).  In considering those factors, the Court is directed to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." Id.  Those factors and purposes include, in pertinent part:
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
>> (A) to reflect the seriousness of the offense, to promote        respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant;    and
>> (D) to provide the defendant with needed educational or        vocational training, medical   care, or other correctional    treatment in the most effective manner
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range . . .
> (5) any pertinent policy statement . . .
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(2).

both "promote[s] respect for the law" and "provide[s] just punishment for the offense." *See* 18 U.S.C. §§ 3553(a)(1) and (a)(2)(A).

The Court understands and sympathizes with the Government's desire to rid its prisons of illegal and harmful drugs.  Sympathy notwithstanding, the Government should bear some responsibility to persons like Cani.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on August 21, 2006.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record
United States Magistrate Judge
United States Marshals Service
United States Probation Office
United States Pretrial Services Office
Courtroom Deputy
Westly Brian Cani