**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**OCALA DIVISION**

**UNITED STATES OF AMERICA**

-vs-                                                            **Case No.  5:04-cr-37-Oc-22GRJ**

**WESTLY BRIAN CANI**

_____

**MEMORANDUM RE-SENTENCING OPINION**

**I.  FACTUAL BACKGROUND**[1]

On October 8, 1998, the Defendant, Westly Brian Cani ("Cani"), was sentenced to

a term of 96 months imprisonment for the assault of a United States Postal Service employee

with intent to steal property of the United States, namely stamps.[2]  After previously being

confined at the United States Penitentiary ("USP") in Atlanta, Georgia, Cani was transferred

to USP Coleman in Coleman, Florida on August 21, 2001.  Cani's scheduled release date

was October 8, 2005.

While serving his 96 month sentence at USP Coleman and within two years of his

scheduled release date, Cani, a jailhouse lawyer and a self-professed drug addict, managed

to get caught in the crosshairs of a government-led investigation of drug activity at the

prison.  The investigation, which began in approximately January of 2003, was headed by

Federal Bureau of Investigation ("FBI") Special Agent James Martin Raby, Jr. ("Raby").

---

[1]        The factual background in this case is taken from the Presentence Report and from various
testimony given at Cani's trial.

[2]        Cani's criminal history began at age 17 with a juvenile adjudication for shoplifting in 1972. Prior
to his 1998 conviction for assaulting a postal worker, Cani had also been adjudicated guilty of grand theft, retail
theft, perjury, loitering and prowling, failing to appear, possession of cocaine, attempted purchase of crack cocaine,
carrying a concealed weapon, battery, resisting arrest without violence, possession of a firearm by a convicted felon,
attempted purchase of heroin, and possession of heroin.

USP Coleman inmate Eric Jones ("Jones"), hoping to reduce his life sentence, orchestrated a controlled drug transaction that involved Cani, Cani's cell mate, Harry Kevin Becker ("Becker"), and Jones.

BOP intelligence officers brought Jones to Special Agent Raby's attention as someone who might be able to assist with the investigation. Jones operated a highly profitable illegal gambling pool known as a "ticket" at USP Coleman. Jones' ticket, which was against prison rules, allowed inmates to place bets on various sporting events. United States postal stamps are the inmates' currency of choice at Coleman, and Jones' activities allowed him to accumulate numerous books of stamps.

One day, an intelligence officer entered Jones' cell and found a large amount of stamps. The stamps were confiscated and Jones' attempts to recover his stamps from the officer were unsuccessful. Jones says that sometime thereafter, the intelligence officer asked Jones if he wanted his stamps back "in helping him assist cleaning up the compound full of drug activity." When Jones passed up the offer, the intelligence officer asked Jones what Jones would be interested in. It is not surprising that Jones, an inmate serving a life sentence for a drug-related offense, responded that he would be interested in "going home."

Jones stated during trial that he was told that he was at his own risk if he continued his gambling activities within the prison before Washington, D.C. gave "approval." The approval Jones' was referring to was the authorization that Special Agent Raby needed from the Department of Justice to utilize Jones in the investigation and to allow Jones to continue operating his gambling ring. It is unclear how long it took for Special Agent Raby to receive authorization. Nevertheless, there is no evidence in the record to suggest that Jones'

activities were terminated or otherwise interrupted by law enforcement between the time that Jones was solicited to be an informant and the time that he was authorized as one.

Jones testified at trial that he knew Cani prior to becoming a Government informant. Jones and Cani both worked on the same "detail," collecting trash around the prison compound. Jones also testified that after he and Cani "got to know each other," Cani assisted Jones with filing motions for relief from his prior convictions in state court.

On November 19, 2003, Jones informed the FBI that Becker and Cani were selling heroin inside Coleman. Jones stated that on November 17, 2003, he observed a BOP correctional officer place a cigarette pack on a bench outside the H-unit at Coleman. Jones then observed Becker retrieve the pack. Within a few hours, Becker was selling heroin within the Coleman compound.

Jones was given a body recorder on November 19, 2003. The recorder contained eight different recording sessions. Three of those recordings are summarized as follows:

> Recording Number 4: On November 20, 2003, at approximately 12:43 p.m., Jones and Ray Gonzalez discuss a previous heroin deal. Jones also has a conversation with Cani. Cani advised Jones that Becker no longer had grams of heroin to sell, but will sell Jones 11 papers of heroin for 40 books of stamps, whereas the stamps are valued at $5.00 per book.

> Recording Number 5: On November 20, 2003, at approximately 1:31 p.m., Jones meets with Becker and pays him 40 books of stamps for 11 papers of heroin.

> Recording Number 8: On November 20, 2003, at approximately 7:28 p.m., Jones meets with Cani and accepts 11 papers of heroin.

On November 21, 2003, Special Agent Raby recovered the body recorder that had previously been given to Jones and 10 or 11 packets[3] of powdered heroin.

On May 24, 2004, an FBI agent interviewed Becker about his involvement with heroin distribution at Coleman. Becker was advised of his *Miranda* rights and waived them. Becker stated that he has been a long-time heroin user and that he regularly used heroin with his friend, Cani. Becker further stated that he and Cani usually purchased heroin for personal use, but on one occasion did sell heroin to another inmate at Coleman. The sale occurred in November 2003 and was initiated when Jones approached Cani about the purchase of one gram of heroin. Becker stated that on the same day that Jones approached Cani about the sale, Becker and Cani met with Jones in the recreation yard to discuss the details of the heroin purchase. Becker advised Jones that he did not have gram quantities of heroin to sell, but could provide him with papers. Becker agreed to sell Jones approximately 10 papers of heroin in exchange for 40 books of stamps. The next day, Becker met with Jones and received 40 books of stamps for the negotiated heroin purchase. Becker then took the stamps and provided them to another inmate who he and Cani regularly purchased from. Becker stated that the inmate then provided Jones with the 10 papers of heroin purchased and also provided Cani and Becker with four hits of heroin as payment for their finders' fee. Becker stated that he and Cani used the four hits of heroin later that day and joked about how Jones was probably setting them up.

---

[3]     The use of the word "packets" instead of "papers" may be the result of a typographical error in the Presentence Report.

On May 24, 2004, Agent Raby interviewed Cani about his involvement with the distribution of heroin at Coleman.  Cani was advised of his *Miranda* rights, waived them, and submitted the following written statement:

> I have been at Coleman USP since August of 2001.  I started using heroin in May of 2002 until February 2004. During this time period I possessed heroin and did what I had to do to obtain it.  I gambled to get money and did legal work to buy it.  I would occasionally give some to friends.  Inmate Jones had given me heroin on a couple of occasions.  My cellie Becker and I would get high together and we would purchase heroin occasionally.  I knew the possession of heroin in a fed prison was wrong and I regret my actions.  I have cooperated with the FBI to the best of my ability and recollection and want to get this matter resolved.  I have a disease of drug addiction and need help.  I just want to stop using drugs and get home to my children.

Cani denies that he ever negotiated the sale, collected payment for the sale, or provided heroin to Jones.  The amount of heroin that Cani was responsible for is at least one-tenth of a gram.

On July 28, 2004, a Grand Jury for the Middle District of Florida, Ocala Division, returned a four-count Indictment (Doc. No. 1) against Cani.  Count One charged that Cani knowingly and intentionally conspired to distribute, and to possess with intent to distribute, heroin in violation of 21 U.S.C. § 846.  Count Two charged that Cani knowingly, willfully, and intentionally distributed, and caused the distribution of, heroin in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and 18 U.S.C. § 2.  Count Three charged that Cani, while an inmate of a federal prison, knowingly, willfully, and intentionally obtained and attempted to obtain, and caused the obtaining of a prohibited object, heroin, in violation of 18 U.S.C. § 1791(a)(2), (b)(1), and (d)(1)(C) and 18 U.S.C. § 2.  Count Four charged that Cani knowingly, willfully, and intentionally provided and caused to be provided a prohibited

object, heroin, to an inmate of a federal prison in violation of 18 U.S.C. § 1791(a)(1), (b)(1), and (d)(1)(C) and 18 U.S.C. § 2. On June 17, 2005, the Government filed a sentencing enhancement notice pursuant to 21 U.S.C. § 851. On June 22, 2005, a jury found Cani guilty on all four counts.

## II.  GUIDELINE RECOMMENDATIONS

Counts involving substantially the same harm are grouped together into a single group. *See* USSG § 3D1.2. In Cani's case, all four Counts are grouped together.[4] When such grouping occurs, the Guidelines direct that the offense level applicable to a group is the offense level applicable to the most serious count in the group. *See* USSG § 3D1.3(a). In Cani's case, Count Four, which charged violations of 18 U.S.C. § 1791, has the highest offense level.

The guidelines for sentencing violators of 18 U.S.C. § 1791 are found in USSG § 2P1.2. Section 2P1.2(a)(2) assigns a base level 13 for the mere possession of a narcotic drug in prison.[5] That base level doubles, however, when the element of distribution is factored into the offense. Section 2P1.2(c)(1) states that "[i]f the object of the offense was the distribution of a controlled substance, apply the offense level from § 2D1.1." Because .10 grams of heroin is at issue, Cani would have a base level of 12 under § 2D1.1(c). Cani's base level would increase by an additional two levels under § 2D1.1(b)(3) because "the

---

[4]    Cani's Counts are grouped together because Count One charges a conspiracy and Count Two charges the object of that conspiracy, *see* USSG § 3D1.2(b), and because Counts Three and Four embody conduct that is treated as a specific offense characteristic to the guideline applicable to Counts One and Two. *See* USSG § 3D1.2(c).

[5]    Heroin is a narcotic drug. *See United States v. Marizal*, 421 F.2d 836, 837 (5th Cir. 1970) (holding that a district court correctly took judicial notice of the fact that heroin is a narcotic drug).

object of the offense was the distribution of a controlled substance *in a prison*."  Therefore,

Cani's base level under § 2D1.1 would be 14.  However, § 2P1.2(c)(1) goes on to state that

"if the defendant is convicted under 18 U.S.C. § 1791(a)(1) and is punishable under 18

U.S.C. § 1791(b)(1), and the resulting offense level is less than level 26, increase to level

26."  Therefore, because Cani was convicted of providing or attempting to provide a

prohibited object to an inmate under 18 U.S.C. § 1791(a), his base level automatically

increases from a level 14 to a level 26.  By contrast, if Cani had merely possessed the heroin

instead of passing it along to an inmate, his base level would only be 13.  In effect, Cani's

base offense level is 13 levels higher than if he had merely possessed the heroin in prison

instead of passing it along to an inmate.  Also, had Cani merely possessed the heroin on the

street instead of in a prison, his base level would only be 12 instead of 26.  *See*  USSG §

2D1.1(c).

Additionally, Cani is a career offender as defined in USSG § 4B1.1.  As such, Cani's

sentence under the Guidelines would be subject to enhancement.  Cani's two prior felony

convictions for crimes of violence enhance his statutory maximum penalty to 30 years.  As

such, Cani's total offense level increases from a 26 to 34.  Additionally, Cani's criminal

history is a category VI.  According to the sentencing table, Cani's recommended sentence

under the Guidelines would be between 262 to 327 months, or 21 years and 10 months to 27

years and 3 months.[6]

### III.  THE ORIGINAL SENTENCE

---

[6]At the previous sentencing hearing, the Court denied Cani's objections to the Guidelines calculation.

Cani was initially sentenced on October 27, 2005.  The Court departed downward and sentenced Cani to twelve months imprisonment with 180 days of community confinement. The Government appealed that sentence.

The Court of Appeals for the Eleventh Circuit reversed, finding that this Court erred in issuing a downward departure.  Specifically, the appellate court determined that the Guidelines expressly precluded this Court from basing a downward departure on Cani's drug addiction.  Additionally, the Eleventh Circuit concluded that this Court failed to provide an adequate explanation for other grounds for departure.  However, the appellate court expressly declined to reach the separate question of whether Cani's sentence was unreasonable.

## IV.  LEGAL ANALYSIS

The Supreme Court in *United States v. Booker*, 543 U.S. 220, 259 (2005), excised the portions of the Federal Sentencing Act, 18 U.S.C. §§ 3553(b)(1) and 3742(e), that made the application of the Guidelines mandatory.  The *Booker* Court wrote:

> The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.  The courts of appeals review sentencing decisions for unreasonableness.  These features of the remaining system, while not the system Congress enacted, nonetheless continue to move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary.

*Id.* at 767 (citations omitted).  Therefore, while courts have flexibility in determining an appropriate sentence, is still necessary for this Court to take the Guidelines into account.

Section 3553(a) of the Federal Sentencing Act lists several "[f]actors to be considered in imposing a sentence."  18 U.S.C. § 3553(a).  A district court is obliged to consider all of these factors in fashioning an appropriate sentence.  *United States v. Pugh, -* F.3d -, 2008 WL 253040 *9 (11th Cir. Jan. 31, 2008).  Section 3553(a) directs a sentencing judge, when considering these factors, to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." § 3553(a).  The listed factors and purposes include, in pertinent part:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range [established by the Guidelines];
> (5) any pertinent policy statement [issued by the Sentencing Commission];
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

This Court does not believe that the sentencing range of 262 to 327 months recommended by the Guidelines adequately complies with the purposes set forth in 18 U.S.C. § 3553(a)(2) and believes instead that the Guidelines would impose a sentence far

greater than necessary.  In light of the Government's role in the drug transaction, Cani's heroin addiction, the small amount of the drug involved, and the other factors discussed herein, a non-Guidelines sentence is more appropriate.  In this particular case, the Court determines that an appropriate sentence is 60 months total imprisonment.[7]

## A.  Nature and Circumstances of the Offense

Without diminishing in any way the seriousness of delivering heroin to another person in any quantity, especially in the prison setting, the fact remains that this was a low-level drug offense.  The drug amount was quite small.  There is no evidence that Cani was involved in actually smuggling drugs into the prison, and all indications are that he was a very low-level drug dealer.  As previously stated, if Cani had  merely possessed the heroin instead of passing it along to an inmate, his base level would only be 13.  In effect, Cani's base offense level is 13 levels higher than if he had merely possessed the heroin in prison instead of passing it along to an inmate.  Also, had Cani merely possessed the heroin on the street instead of in a prison, his base level would only be 12 instead of 26.

Furthermore, the Government's construction of the transaction to include a distribution offense augmented the harshness of the penalty that Cani would face.  Had the transaction ended with Jones' payment to Becker, or with Cani's mere possession of the ten papers, the sentence recommended by the Guidelines would be drastically lower.

## B.  The History and Characteristics of the Defendant

---

[7]This consists of 30 months imprisonment on Counts One and Two, and 30 months on Counts Three and Four.  These prison terms run consecutively in accordance with 18 U.S.C. § 1791(c).  Additionally, the Court imposed a term of supervised release and a number of special conditions, all of which are specified in the criminal judgment.

The predominant circumstance implicated by this factor is Cani's drug addiction.[8] While drug addiction cannot afford a basis for a downward departure, it can be factored into the § 3553 calculus. *United States v. Garcia*, 497 F.3d 964, 971-72 (9th Cir. 2007).

Cani is a heroin addict, and the Bureau of Prisons knew of his addiction. However, Cani has no prior convictions for drug distribution. By contrast, there is a great deal of evidence about Cani's history of substance abuse.

Cani advised that he initially smoked marijuana when he was 14 years old and that he began drinking alcoholic beverages when he was 17 years old, activities that he continued on a sporadic social basis until his arrest on February 5, 1998. Cani also advised that he has experimented with amphetamines, barbiturates, and hallucinogens. Cani stated that he first used powder cocaine in 1980 on a social basis. Cani's use increased to free-basing and "shooting" the substance or using "crack cocaine" when nothing else was available. Cani claims that he used cocaine daily from 1980 until his arrest on February 5, 1998. In order to support his cocaine habit, Cani sold his residence and other assets before eventually turning to crime. Cani stated that he attended drug treatment in the Martin County Correctional Facility in 1993 and as a result, his cocaine use slowed. However, at that point Cani started using heroin. Cani explained that he "shot" heroin every day from 1993 to the time of his arrest in February of 1998, a habit that cost Cani between $200 and $300 daily.

Cani stated that he began to use heroin again between May 2002 and February 2004 while incarcerated at USP Coleman. While at Coleman, Cani tested positive for heroin on

---

[8]Other relevant personal circumstances are that Cani's wife died in 2004 from a heroin overdose. Cani's two children are apparently in foster care, but according to Cani, he retains his parental rights over those children. Additionally, Cani needs a liver transplant. The BOP advises that such a procedure is available to its inmates.

January 30, 2003, May 3, 2003, and January 7, 2004.  Additionally, on August 27, 2002, Cani admitted to drug use though no urinalysis was taken.  Cani says that from 1983 to 1998, he has been imprisoned and "cleaned up" approximately four times and each time he experienced withdrawals, but when released and placed in a stressful situation, he reverted to drug use.  Also, since being incarcerated at Coleman, Cani has completed a 40 hour drug education class.  However, Cani readily acknowledges that he has a drug problem and he wants treatment.

By inviting Cani to participate in a transaction in close proximity to heroin, the drug to which he is addicted, the Government exerted a sort of pressure on Cani.  Although in Cani's situation the Government's actions did not rise to the level of entrapment, Cani's addiction to heroin likely made him more susceptible to being involved in a transaction involving that substance.  Additionally, the Government's use of Eric Jones as an informant is troubling.  There was evidence proffered, which Jones denied, that Jones had previously given heroin to Cani for his personal use.  Jones, who was serving a life sentence, was able to engage Cani in the controlled transaction as easily as he did because of his prior relationship with Cani.  The Government was able to use that prior relationship to entice Cani, who was nearly finished serving his prison term, to participate in the transaction.  Jones himself had nothing to lose by participating – he was already serving life in prison and cooperating with the Government provided him a possible opportunity to gain a reduction in his sentence.

### C.  Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment; Deterrence; Protection of the Public

The Court determines that all these factors are adequately served by a 60-month sentence of imprisonment.   This is a significant sentence, particularly given the characteristics of this particular offense.   In light of the small drug quantity involved – roughly one-tenth of a gram – and given the circumstances of the offense – a transaction largely orchestrated by the Government – a 60-month sentence will serve as an adequate deterrent for similar behavior, promote respect for the law, and provide "just deserts." Moreover, a sentence of this duration will afford Cani a chance to fully rehabilitate - principally by "kicking" his drug habit - thereby protecting the public from further criminal behavior on Cani's part.  Conversely, imposing the sentence recommended by the Guidelines would be too Draconian.

### D.  The Need for the Sentence Imposed to Provide the Defendant With Drug Treatment

Cani unquestionably needs further drug treatment.  His post-release history evidences adjustment difficulties in that regard.   A 60-month sentence will provide him with an opportunity to continue that treatment.   The Court feels so strongly about this that it has delayed Cani's surrender date until the BOP notifies the Court that Cani may immediately begin the BOP's 500-hour drug treatment program.   At the resentencing hearing, the prosecutor assured the Court that a ranking BOP official guaranteed that Cani would be admitted to that program.

### E. The Kinds of Sentences Available

As previously stated, the long sentence of imprisonment ordinarily suggested by the Guidelines is too Draconian a punishment in this particular case.  A sentence calling for no

-13-

incarceration, or a very short period of imprisonment, would not serve the other interests implicated by § 3553.  This Court believes the middle ground is the better course.  A 60-month sentence is significant, and it will adequately protect the public and give Cani a chance to overcome his addiction.

Although the Court initially imposed a 12-month sentence, a sentence that short is no longer appropriate.  This is because Cani relapsed in his drug use after being released from prison, and it is starkly obvious that he needs long-term, intensive drug treatment in a highly-controlled setting.  Moreover, the BOP has now agreed to admit Cani to its 500-hour drug treatment program.  A longer sentence is therefore necessary to provide Cani with a better chance to overcome his addiction.

### F.  The Sentence and Sentencing Range Suggested by the Guidelines

This factor is addressed in Section II, *supra*.  However, the sentence suggested by the Guidelines is unduly harsh given the particular circumstances of this case.

### G.  Any Pertinent Policy Statements

As the Eleventh Circuit observed in reversing the original sentence this Court imposed, the Guidelines prohibit using drug addiction as a basis for a downward departure.  USSG §§ 5H1.4 & 5K2.0(d)(1).  However, there is no prohibition against factoring drug addiction into the § 3553 calculus.  In fact, § 3553(a)(1) compels a sentencing court to take into account the "history and characteristics of the defendant."  For this reason, it is entirely appropriate to consider a defendant's drug addiction in fashioning an appropriate sentence.  *United States v. Garcia,* 497 F.3d 964, 971-72 (9th Cir. 2007).

### H.  Avoiding Sentencing Disparity

At the resentencing hearing, the Government pointed out that another district judge sentenced Cani's cellmate, Harry Becker, to a prison term of 180 months. The Government maintains that giving Cani a "minimal" sentence would result in an impermissible sentencing disparity. In the Court's view, a 60-month prison term is hardly minimal. Additionally, this Court has not seen Becker's PSR and, accordingly, is not aware of the circumstances that resulted in a 180-month sentence. In any event, to the extent this factor might cut in favor of giving Cani a harsher sentence, it is overbalanced by the other § 3553 criteria that call for a lesser sentence.[9]

## V. CONCLUSION

In sum, this is an unusual case. Cani's drug addiction cannot simply be ignored for sentencing purposes. His addiction to heroin landed him in the federal prison system to begin with and that is what put him in a criminal history category VI. The sentencing judge in Cani's one prior federal case requested the Bureau of Prisons to provide Cani with drug treatment while in BOP custody. Cani was given a forty hour drug course that was never repeated despite Cani's continued use of heroin during his incarceration. To reiterate, there was no evidence presented suggesting that Cani was bringing drugs into the prison or that he was a big-time dealer. Moreover, none of Cani's prior convictions were for drug distribution. Finally, there was evidence indicating that a prison guard (or guards) was responsible for introducing the drugs into USP Coleman.

---

[9]The remaining factor - the need for restitution - is inapplicable.

The Court understands and sympathizes with the Government's desire to rid its prisons of illegal and harmful drugs.  Sympathy notwithstanding, the Government should bear some responsibility to persons like Cani.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on February 14, 2008.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record
United States Magistrate Judge
United States Marshals Service
United States Probation Office
United States Pretrial Services Office
Courtroom Deputy
Westly Brian Cani